**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION**

| | | |
|---|---|---|
| In re: | x ) | Chapter 11 |
| SPECTRUM HEALTHCARE, LLC | ) ) | Case No. 16-21635 (JJT) |
| Debtor, | ) ) x | |
| In re: | ) | Chapter 11 |
| SPECTRUM HEALTHCARE DERBY, LLC | ) ) | Case No. 16-21636 (JJT) |
| Debtor, | ) ) x | |
| In re: | ) | Chapter 11 |
| SPECTRUM HEALTHCARE HARTFORD, LLC | ) ) ) | Case No. 16-21637 (JJT) |
| Debtor, | ) ) x | |
| In re: | ) | Chapter 11 |
| SPECTRUM HEALTHCARE MANCHESTER, LLC | ) ) | Case No. 16-21638 (JJT) |
| Debtor, | ) ) x | |
| In re: | ) ) | Chapter 11 |
| SPECTRUM HEALTHCARE TORRINGTON, LLC | ) ) | Case No. 16-21639 (JJT) |
| Debtor. | ) ) x | |

**DEBTORS' MOTION FOR A PRELIMINARY AND FINAL ORDER
(1) AUTHORIZING THE USE OF CASH COLLATERAL
(2) GRANTING ADEQUATE PROTECTION, (3) SETTING
THE DATE OF A FINAL HEARING, AND (4) RELATED RELIEF**

Spectrum Healthcare, LLC ("Spectrum"), Spectrum Healthcare Torrington, LLC

("Spectrum Torrington"), Spectrum Healthcare Derby, LLC ("Spectrum Derby"), Spectrum

Healthcare Hartford, LLC ("Spectrum Hartford"), and Spectrum Healthcare Manchester, LLC

("Spectrum Manchester") (collectively, the "Affiliates") and jointly with Spectrum, the debtors

and debtors in possession (the "Debtors"), by their undersigned counsel, hereby move this Court for entry of an order, pursuant to Sections 105, 361, 362, 363, and 507 of Title 11 of the United States Code (the "Bankruptcy Code") authorizing: (a) the use of cash collateral in which the following parties have or may claim an interest: (i) MidCap Funding IV Trust, a Delaware statutory trust (formerly known as MidCap Funding IV, LLC), as successor-by-assignment from MidCap Financial Trust (formerly known as MidCap Financial, LLC) (collectively referred to as "Midcap"); (ii) Nationwide Health Properties, LLC ("NHP"); (iii) CCP Park Place 7541 LLC and CCP Torrington LLC ("CCP Landlords"), as assignees of NHP with respect to the NHP Lease (as defined below); (iv) Midland States Bank ("Midland"), as assignee of Love Funding Corporation ("LFC"); (v) the Secretary of Housing and Urban Development ("HUD") as additional secured party with LFC, now Midland; and (vi) the State of Connecticut, Department of Revenue Services ("DRS") (collectively, the "Secured Parties"), (b) use of cash collateral both on a preliminary basis to pay those items set forth in the budget submitted herewith and appended hereto as Exhibit A, and on a final basis, (c) the adequate protection of the secured parties by granting to them replacement or substitute liens, (d) setting the date of a final hearing on this motion and (e) the granting of related relief. The final budget will be submitted to the Court prior to the final hearing on use of cash collateral.

In support of this motion, the Debtors respectfully represent as follows:

**JURISDICTION**

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these proceedings and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The relief sought in this Motion is based upon sections 105, 361, 362, 363, and 507 of Title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

3.      On October 6, 2016 (the "Petition Date"), each of the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  A Motion for Joint Administration of the Debtors' cases has been made concurrently herewith.

4.      No committee of unsecured creditors has been appointed in this case.

5.      Spectrum is a Connecticut  limited liability company that is engaged in the business of managing nursing homes.  It is located at 27 Naek Road, P.O. Box 2417, Vernon, Connecticut 06066-1817.  It manages the Affiliates whom operate nursing homes.

6.      Spectrum Torrington is a Connecticut limited liability company that is engaged in the business of operating a skilled 126 bed nursing home.  The facility is located at 225 Wyoming Avenue, Torrington, Connecticut  06790.

7.      Spectrum Derby is a Connecticut limited liability company that is engaged in the business of operating a skilled 120 bed nursing home.  The facility is located at 210 Chatfield Street, Derby, Connecticut  06418.

8.      Spectrum Hartford is a Connecticut limited liability company that is engaged in the business of operating a skilled 150 bed nursing home.  The facility is located at 5 Greenwood Street, Hartford, Connecticut  06106.

9.      Spectrum Manchester is a Connecticut limited liability company that is engaged in the engaged in the business of operating a skilled 155 bed nursing home.  The facility is located at 565 Vernon Street, Manchester, Connecticut 06042.

10.      Collectively, there are 551 beds in the Debtors' facilities. The Debtors have approximately 600 employees.  Approximately 400 of the Debtors' employees belong to the

New England Health Care Employees Union District 1199 .  The Debtors' monthly payroll is approximately $1,766,000 ($1,727,000 for their employees and $39,000 for their officers).

11.     The Debtors' books and records indicate that as of the Petition Date, the Debtors had assets totaling approximately $12,590,000 and liabilities totaling approximately $19,320,000.  The Debtors believe that they can become profitable through a combination of revenues increasing and expenses being reduced.

12.     The Debtors previously filed for relief under  Chapter 11 of the Bankruptcy Code on September 10, 2012, and after eight months of operating in Chapter 11, the Debtors confirmed a joint Chapter 11 plan of reorganization and emerged from bankruptcy on May 7, 2013.

13.     Unfortunately, since emerging from its first Chapter 11 proceeding, the Debtors have continued to encounter financial obstacles and once again have no choice but to file Chapter 11 in order to stabilize operations. The Debtors have commenced these Chapter 11 cases to restructure their operations and to insure their long-term viability through a plan of reorganization subject to Court approval.

14.     The Debtors filed for chapter 11 because they were unable to pay their debts as they were coming due for a multiplicity of reasons.  One of the reasons giving rise to the Debtors' cash flow problems is due to the fact that the current property values and income do not support the debt structure.  Midcap Funding currently holds a mortgage against real estate owned by Spectrum Manchester Realty, LLC and leased to Manchester. Midcap Financial began accelerating the debt in June 2013, which acceleration increased substantially in November 2014. As a result of the acceleration, the monthly rent Spectrum Manchester pays increased from

4

$92,000 per month to $135,000 per month, which equates to an annual increase of $516,000 in rental obligations.

15.     The State of Connecticut has also reduced Medicaid rates such that the reimbursements that the Debtors receive through Medicaid services are no longer sufficient to cover the standard of care provided.  In addition to the Medicaid shortfall, Spectrum Derby, Spectrum Hartford, Spectrum Manchester and Spectrum Torrington collectively owe the State of Connecticut in excess of $2 million dollars for provider taxes.   These factors, combined with an unstable economy, where elective surgeries are down, have combined to produce an environment where not only are the rates down, but occupancy is down, as well.

### SUMMARY OF RELIEF REQUESTED

16.     The parties that have or may claim an interest in cash collateral have been identified in the opening paragraph of this Motion.

17.     The purposes for which the use of cash collateral has been requested are, generally, to allow the Debtors to continue to operate their businesses and, more particularly, to pay for the ordinary and necessary expenses that the Debtors must pay to continue in operation, which are itemized on the budget attached hereto as Exhibit "A".

18.     The material terms of the proposed use of cash collateral consist of the granting of replacement liens to the Secured Parties in the assets of the Debtors that are generated post-petition to the same validity, priority and extent of the Secured Parties' respective liens and security interests in the accounts receivable, deposit accounts, cash and other assets of the Debtors giving rise to the creation of the cash collateral sought to be used hereby.  The duration of cash collateral use is expected to be on a preliminary basis for three to four weeks and thereafter for a two-month period.

### ENTITIES WITH AN INTEREST IN CASH COLLATERAL

5

## AND DESCRIPTION OF SECURED INDEBTEDNESS

### A.    Spectrum Borrowers' Obligations to Midcap Funding IV Trust, As Successor-By-Assignment to Midcap Financial, LLC

19.    In connection with the confirmation and implementation of the Second Amended Plan of Reorganization for Spectrum Healthcare, LLC, Spectrum Healthcare Torrington, LLC, Spectrum Healthcare Derby, LLC Spectrum Healthcare Hartford, LLC and Spectrum Healthcare Manchester, LLC (the "Plan"), which was confirmed by Order entered on May 7, 2013, Midcap Financial, for itself and as agent for other lenders, made available to the Debtors, except for Spectrum Derby (the "Spectrum Borrowers"), a revolving credit facility in the aggregate principal amount of up to $5,000,000 pursuant to a Credit and Security Agreement dated as of June 13, 2013 (the "June 13, 2013 Credit and Security Agreement"). In connection with the June 13, 2013 Credit and Security Agreement, the Spectrum Borrowers executed and delivered a Revolving Credit Note in favor of Midcap Financial in the amount of $5,000,000 and dated as June 13, 2013 (the "June 13, 2013 Note").

20.    The obligations under the June 13, 2013 Credit and Security Agreement and the June 13, 2013 Note were secured by duly perfected security interests in substantially all assets of the Spectrum Borrowers, including all accounts receivable, proceeds thereof and deposit accounts.

21.    By an Amended and Restated Credit and Security Agreement dated as of August 27, 2014 (the "August 27, 2014 Credit and Security Agreement"), the June 13, 2013 Credit and Security Agreement was amended whereby, *inter alia*, Midcap Funding was substituted for Midcap Financial as its successor-by-assignment and the terms and conditions of the June 13, 2013 Credit and Security Agreement were modified in certain respects.

6

22.     The Spectrum Borrowers and Midcap Funding thereafter entered into two amendments to the August 27, 2014 Amended Credit and Security Agreement: (i) Amendment No. 1 to Amended and Restated Credit and Security Agreement dated as of March 14, 2016, pursuant to which the Spectrum Borrowers executed and delivered to Midcap Funding an Amended and Restated Revolving Loan Note in the amount of $6,250,000 and dated as March 14, 2016; and (ii) Amendment No. 2 to Amended and Restated Credit and Security Agreement dated as of September 30, 2016, pursuant to which the Spectrum Borrowers executed and delivered to Midcap Funding an Amended and Restated Revolving Loan Note in the amount of $7,500,000 and dated as of September 30, 2016.

23.     The obligations under the August 27, 2014 Credit and Security Agreement, the amendments thereto and the Revolving Notes executed and delivered pursuant to such amendments are secured by duly perfected security interests in substantially all of the assets of the Spectrum Borrowers, including all accounts receivable, proceeds thereof and deposit accounts.  The Debtors believe that, as of the Petition Date, the outstanding indebtedness under these secured obligations for Spectrum, Spectrum Hartford and Spectrum Torrington was in the amount of $4,073,230 and for Spectrum Manchester in the amount of $2,211,198.

24.     As part of their lending relationship with Midcap Funding, the Spectrum Borrowers, as well as Spectrum Derby, have a lockbox arrangement whereby the funds they receive for services provided to their patients, typically from Medicare, Medicaid and insurance companies (the "Collections"), are paid into accounts ("Collection Accounts") maintained at Wells Fargo Bank, N.A. (the "Bank").  The Collection Accounts are governed by a Deposit Account Control Agreement as to non-governmental receivables and a Collection Account Agreement as to governmental receivables.  The Deposit Account Control Agreement, the

7

Collection Account Agreement and other ancillary documents direct the funds in the Collection
Accounts to be swept each business day, into one or more payment or destination accounts,
whereupon the funds are then used by Midcap Funding to reduce the amounts extended under the
revolving lines of credit for the Spectrum Borrowers and Spectrum Derby.

25.    The Spectrum Borrowers are also obligated to Midcap Financial or Midcap
Funding, as successor-by-assignment to Midcap Financial, under certain guarantees of affiliate
entities.  Pursuant to a Cross-Collateralization, Cross Default and Cross-Guaranty Agreement
dated as of June 13, 2013, the Spectrum Borrowers guaranteed the obligations of Spectrum
Manchester Realty, LLC under a Credit and Security Agreement dated as of February 22, 2011
(as amended, restated, or otherwise modified from time to time), in relation to a term loan to
Spectrum Manchester Realty, LLC in the amount of $10,500,000.  Pursuant to a Payment
Guaranty executed and delivered to Midcap Financial and dated as of June 13, 2013, the
Spectrum Borrowers guaranteed the obligations of Spectrum Derby for a loan and other
revolving credit accommodations to Spectrum in the amount of $1,250,000 pursuant to a Credit
and Security Agreement between Spectrum Derby and Midcap Financial, dated as of June 13,
2013.

### B.    Spectrum Derby Obligations to Midcap Funding, as Successor-By-Assignment to Midcap Financial

26.    In connection with the confirmation and implementation of the Plan, Midcap
Financial made available to Spectrum Derby a revolving credit facility in the aggregate principal
amount of up to $1,250,000 pursuant to a Credit and Security Agreement dated as of June 13,
2013, as amended, restated or otherwise modified from time to time (the "Spectrum Derby June
13, 2013 Credit and Security Agreement").  In connection with the Spectrum Derby June 13,

2013 Credit and Security Agreement, Spectrum Derby executed and delivered a Revolving Loan

Note in favor of Midcap Financial in the amount of $1,250,000 and dated as of June 13, 2013

(the "Spectrum Derby June 13, 2013 Note").

27.     The obligations under the Derby June 13, 2013 Credit and Security Agreement

and Derby June 13, 2013 Note are secured by duly perfected security interests in substantially all

assets of Spectrum Derby, including all accounts receivable, proceeds thereof and deposit

accounts.  The Debtors believe, as of the Petition Date, that the outstanding indebtedness under

these obligations was $1,244,879.

**C.     Spectrum Hartford and Spectrum Torrington Obligations To NHP and The CCP Landlords**

28.     Spectrum Hartford and Spectrum Torrington (collectively, the "Spectrum

Tenants") are parties to a certain Master Lease dated June 13, 2013 (the "NHP Lease"), pursuant

to which the Spectrum Tenants leased from Nationwide Health Properties, LLC ("NHP") two

skilled nursing facilities from which they operate their businesses.  The Lease has been assigned

to CCP Park Place 7541, LLC and CCP Torrington LLC (the "CCP Landlords").

29.     Pursuant to the NHP Lease, the Spectrum Tenants granted NHP security interest

in "Tenant Property" and the product and proceeds thereof, which grant continues the security

interest previously granted to NHP under the previous Master Lease between the parties.

30.     The Spectrum Tenants also have loan obligations to NHP pursuant to a Fifth

Amendment to Amended and Restated Loan and Security Agreement, dated June 13, 2013,

which, with intervening amendments, relates back to that certain Amended and Restated Loan

and Security Agreement dated January 1, 2005 (the "NHP Loan").  As of the Petition Date, the

amount outstanding with the NHP Loan was in the approximate amount of $825,000.  The NHP

Loan is evidenced by that certain Amended and Restated Secured Promissory Note, dated March

28, 2006, as amended, in the original principal amount of $900,000.  To secure the obligations

relating to the NHP Loan and accompanying note, as amended, the Spectrum Tenants granted

NHP a security interest in substantially all of their assets and all products and proceeds thereof.

31.     Pursuant to an Intercreditor Agreement dated June 13, 2013, between Midcap

Financial, Midcap Funding II, LLC, NHP and the Spectrum Borrowers, NHP subordinated its

security interest in the assets of the Spectrum Tenants, except for certain deposits under the

Lease and insurance policies, to the security interests of Midcap Financial and Midcap Funding

II, LLC.  NHP thereafter assigned its interest in the NHP Lease to the CCP Landlords.  Thus, as

to cash collateral assets such as accounts receivable, the proceeds thereof, deposit accounts and

cash, Midcap Financial and its successor-by-assignment, Midcap Funding, have a prior secured

position, relative to NHP's secured position or the CCP Landlord's secured position.

**D.     Spectrum Derby Obligations to Midland States Bank, as Assignee of
Love Funding Corporation**

32.     Love Funding Corporation ("LFC") made loans and/or extensions of credit to or

for the benefit of Spectrum Derby Realty, LLC ("Spectrum Derby Realty"), which are secured

by a mortgage against real estate which is leased by Spectrum Derby Realty to Spectrum Derby

and used by Spectrum Derby to operate a skilled nursing facility.

33.     To further secure the loans made by LFC to Spectrum Derby Realty, Spectrum

Derby granted to LFC a security interest in certain collateral that includes collateral which is the

subject of the security interest granted to Midcap Financial by Spectrum Derby.  HUD, which

guaranteed the mortgage against the property leased to Spectrum Derby, is identified as an

additional secured party with LFC.

34.     By Intercreditor Agreement dated June 13, 2013, LFC subordinated its security

interest of Midcap Financial for all of what is defined as "AR Lender Priority Collateral," which

includes all present and future accounts, government contracts, money, deposit accounts and the proceeds and product of the foregoing. Midland Loan Services, Inc. ("Midland") is the assignee of LFC. Thus, as to cash collateral assets such as accounts receivable, the proceeds thereof, deposit accounts and cash, Midcap Financial and its successor-by-assignment, Midcap Funding, have a prior secured position relative to Midland's secured position. As of the Petition Date, the amount outstanding on account of the HUD-guaranteed mortgage was $8,492,738.

### E.      Debtors' Obligations to DRS for Provider Taxes

35.     Each of the Debtors, with the exception of Spectrum, owes pre-petition provider taxes to DRS, for which DRS may claim a lien on certain assets of the Debtors that may constitute cash collateral.

### RELIEF REQUESTED

36.     Pursuant to Fed. R. Bankr. P. 4001(b)(2), the Debtors request authority to use cash collateral pending a final hearing in the amount that is necessary to avoid immediate and irreparable harm until a final hearing can be held and, thereafter, continued use of a cash collateral for an approximate two-month period.

37.     Pending a final hearing, the Debtors propose to use cash collateral for the four-week period commencing on October 13, 2016, in the amounts and for the purposes set forth in the budget attached hereto as Exhibit "A" (the "Budget"). The Debtors request that the Court grant authority for such use by entry of the annexed preliminary order (the "Preliminary Order") and set down a final hearing for November 9, 2016. Thereafter, the Debtors request authority to use cash collateral for an approximate two-month period, as set forth in the Budget, on the same terms set forth in the Preliminary Order or such additional or other terms as may be mutually agreed upon by the Debtors and the secured parties with an interest in cash collateral (the "Secured Parties"), or as ordered by the Court.

11

38.     If, during the cash collateral period, any category of expense to be paid is more than 5% over the budgeted amount, or if payment is needed for an expenditure not included in the budget, the Debtors shall, before payment, follow the procedure below:

(a)     A fax shall simultaneously be sent to respective counsel for the Secured Parties requesting authority to pay the item with an explanation.

(b)     If the Debtors do not receive an objection within 12 hours of their faxes, the item or items can be paid.

(c)     If an objection is received a conference shall be set up with the Court or any other party designed by the Court and its decision shall be final.

39.     As ancillary relief pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, the Debtors request an order directing Midcap Funding and the Bank to allow the Debtors unfettered access to the Collection Accounts so the funds deposited therein may be used by the Debtors as cash collateral consistent with the terms of this Order.

40.     It is necessary for the Debtors to retain the Collection Accounts because Medicare, Medicaid and other receivables are wired directly into the Collection Accounts and redirecting the wires would be time consuming, burdensome, and inevitably result in the funds not being available to the Debtors for an unacceptable length of time.  Accordingly, the Debtors propose that rather than having the funds in the Collection Accounts transferred to Midcap Funding to pay down the revolving credit loans, such funds would be transferred directly into the Debtors' operating accounts for use in connection with their operations.  The Debtors must be in a position to transfer the Collections deposited in the Collection Accounts to their operating accounts so that they can issue checks on Spectrum's and its Affiliates' respective operating accounts and payroll accounts.  Each of the Debtors maintain separate operating and payroll accounts.

12

41.    Without an order which permits the Debtors access to the Collection Accounts, they will be unable to use the cash collateral which they are requesting authority to use by this motion.

42.    The Debtors' only source of revenue to pay for their ordinary and necessary operating expenses, thereby enabling them to continue and maintain the operation of their businesses, is from existing cash and the proceeds of accounts receivable in which the Debtors and their Secured Parties have an interest as cash collateral.  The nature and scope of the Debtors' businesses of providing skilled care for their patients, approximating 455 in number, mandate that their day-to-day operations continue.  For that purpose, the Debtors must use cash collateral to: (1) provide their employees with their wages and benefits; and (2) pay for the goods and services to be received from numerous items such as food, medical supplies and drugs.

43.    Section 363(c)(2)(A) and (B) of the Bankruptcy Code provides in summary that "cash collateral" cannot be used without either the consent of the secured party whose cash collateral is requested to be used or by order of the Court after notice and a hearing.  Pursuant to section 363(e) of the Bankruptcy Code, the Court may authorize the use of cash collateral if adequate protection is provided to the entities with an interest in cash collateral.

44.    The Debtors are seeking the use of their cash collateral as per the Budget attached hereto based on the terms of the Preliminary Order and the adequate protection provided therein.

45.    As adequate protection, the Debtors propose to grant Midcap Funding, NHP, the CCP Landlords, Midland, HUD and DRS replacement liens on all cash generated and new receivables created after the Petition Date, with the same priority, force and effect as their respective security interests or liens had as against deposit accounts, cash and accounts receivable of the Debtors prior to the Petition Date, subordinate to a carve-out for amounts

13

necessary to pay U.S. Trustee fees, fees of the Debtors' professionals up to $100,000 and of any

Committee professionals of up to $50,000.

46.    The Debtors believe that Midcap Funding, NHP, the CCP Landlords, Midland,

HUD, and DRS will be adequately protected by replacement liens, inasmuch as the Debtors

expect to maintain at least the same level of cash and receivables as the level existing as of the

Petition Date.  This has been held to constitute sufficient adequate protection to authorize the use

of cash collateral.  See In re Dynaco, 162 B.R. 389, 394-45 (Bankr. D.N.H. 1993).  The Debtors

also expect to operate at least at a break-even level, so that using cash collateral to maintain the

ongoing operations of their businesses is a component of adequate protection.   In re T.H.B.

Corporation, 85 B.R. 192, 195 (Bankr. D. Mass. 1988).

47.    Unless the Debtors receive immediate authorization to use cash collateral, they

will be forced to close down their businesses, discharge their employees and impose a significant

risk to the health and welfare of their patients, who require ongoing care and treatment.  The

result would be a loss of the going-concern value of the businesses and the elimination of any

prospect of a reorganization.  For these and the foregoing reasons, the Debtors request that the

Court immediately hold a preliminary hearing to consider authorizing the use of cash collateral

on the terms set forth above pending a final hearing and that a final hearing be scheduled to

consider authorizing further use of cash collateral.

WHEREFORE, the Debtors respectfully request authority to use cash collateral pending

a final hearing by entry of a preliminary order in substantially the form annexed hereto, and the

scheduling of a final hearing after which the continued use of cash collateral be authorized by the

Court.

Dated: Bridgeport, Connecticut       Respectfully submitted,
         October 6, 2016            Pullman & Comley, LLC
                                          Proposed Attorneys for the Debtors
                                          SPECTRUM HEALTHCARE, LLC ET AL


By:/s/ Irve J. Goldman
     Elizabeth J. Austin (ct04383)
     Irve J. Goldman (ct02404)
     Jessica Grossarth (ct23975)
     Pullman & Comley, LLC
     850 Main Street - P.O. Box 7006
     Bridgeport, CT 06601-7006
     Telephone: (203) 330-2000
     Facsimile: (203) 576-8888
     eaustin@pullcom.com
     igldman@pullcom.com
     jgrossarth@pullcom.com

ACTIVE/1.1/JXG/6066509v1

15