**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF CONNECTICUT
HARTFORD DIVISION**

| | | |
|---|---|---|
| *In re* | ) | Chapter 11 |
| SPECTRUM HEALTHCARE, LLC | ) | Case No. 16-21635 (JJT) |
| Debtor. | ) | **Re: Dkt. No. 4** |
| *In re* | ) | Chapter 11 |
| SPECTRUM HEALTHCARE DERBY, LLC | ) | Case No. 16-21636 (JJT) |
| Debtor. | ) | |
| *In re* | ) | Chapter 11 |
| SPECTRUM HEALTHCARE HARTFORD, LLC | ) | Case No. 16-21637 (JJT) |
| Debtor. | ) | |
| *In re* | ) | Chapter 11 |
| SPECTRUM HEALTHCARE MANCHESTER, LLC | ) | Case No. 16-21638 (JJT) |
| Debtor. | ) | |
| *In re* | ) | Chapter 11 |
| SPECTRUM HEALTHCARE TORRINGTON, LLC | ) | Case No. 16-21639 (JJT) |
| Debtor. | ) | |

**OBJECTION OF MIDCAP FUNDING IV TRUST TO DEBTORS' MOTION FOR A
PRELIMINARY AND FINAL ORDER (1) AUTHORIZING THE USE OF
CASH COLLATERAL (2) GRANTING ADEQUATE PROTECTION,
<u>(3) SETTING THE DATE OF A FINAL HEARING, AND (4) RELATED RELIEF</u>**

1

MidCap Funding IV Trust ("MidCap") hereby submits this objection (the "Objection") to the *Debtors' Motion for a Preliminary and Final Order (1) Authorizing the Use of Cash Collateral (2) Granting Adequate Protection, (3) Setting the Date of a Final Hearing, and (4) Related Relief* (Dkt. No. 4) (the "Cash Collateral Motion").[1]  In support of the Objection, MidCap respectfully represents as follows:

**PRELIMINARY STATEMENT**

1. The Debtors ask the Court to approve their use of MidCap's cash collateral by virtue of a Preliminary Order that does not adequately protect MidCap's interest in the cash collateral and which contains procedures that are prejudicial to MidCap and the other Secured Parties. The Objection should be sustained, and the Court should order adequate protection payments to MidCap and circumscribe some of the overreaching provisions of the Preliminary Order.

2. The Debtors cannot use cash collateral without MidCap's consent, which the Debtors have not sought and which MidCap has not granted, without the authorization of the Court. The only adequate protection that the Debtors propose are postpetition replacement liens. Given that, by the Debtors' own admission, the Debtors' cash position will deteriorate in the first months of the case, replacement liens alone do not adequately protect MidCap's interest in its cash collateral. Furthermore, the Debtors have already received the benefit of MidCap's loans, which loans were made in reliance on the Collection Accounts being used to pay down the loans under the MidCap Revolving Credit Agreement. Now that the Debtors will have daily access to the entire balance of the Collection Accounts, rather than such balance being used to reduce the

---

[1] All terms used but not defined in this Objection shall have the meanings ascribed to them in the Cash Collateral Motion. All terms used but not defined in the Preliminary Statement of this Objection shall have the meanings ascribed to them in the body of the Objection.

2

loan obligations, the Debtors will receive the benefit of the same dollars twice, which favors adequate protection payments to MidCap.

3. In addition, the Debtors fail to budget for potentially significant and unavoidable expenses, such as professional fees and fees payable to the United States Trustee, meaning that the Debtors' cash position will not even be as rosy as the picture they currently paint. Therefore, the Debtors should be required to make adequate protection payments to MidCap in order to protect MidCap from a potential diminution in the value of its cash collateral and to preserve the benefit of MidCap's prepetition bargain.

4. The Debtors also attempt, without justification, to make substantial changes to the Debtors' cash management practices, which threaten the perfection of MidCap's security interest in certain deposit accounts and MidCap's visibility into the Debtors' financial situation. These cash management procedures are part and parcel of the prepetition loan transactions, and the Court should not unravel the procedures where the procedures do not prejudice the Debtors.

5. The Debtors also propose to enact a negative notice procedure by which the Debtors can use MidCap's cash collateral to make payments that could vary considerably from the budgeted amounts approved by the Court. Excessive budget variances should require Court approval, which will give MidCap and the other Secured Parties the chance to be heard and keep the Court apprised of the Debtors' financial situation.

**BACKGROUND**

6. This is the Debtors' second Chapter 11 filing in three years. Six days before these Bankruptcy Cases were filed, the Debtors entered into an amendment of the MidCap Revolving Credit Agreement (as defined herein) without disclosing that the Debtors were contemplating filing the Bankruptcy Cases and representing, among other things, that the Debtors were solvent

and that there had been no material change to the Debtors' financial health and prospects. As a result, the Debtors were able to increase their borrowings from MidCap. Further, over the past three years, the Debtors' borrowing base has consistently been lower than the Debtors' borrowing needs, and, thus, the Debtors have required overadvances from MidCap on numerous occasions. On a recent occasion, to induce MidCap to further extend its lending to the Debtors, the Debtors agreed to remit a workers' compensation premium refund (the "Workers' Compensation Refund"), which the Debtors should receive in February 2017, to pay down the loans under the MidCap Revolving Credit Agreement. However, now that it has filed the Bankruptcy Cases, the Debtors are unwilling to commit, at least in the Preliminary Order, to payment of the Workers' Compensation Refund as a form of adequate protection. Under these circumstances, MidCap requires complete and immediate transparency into the Debtors' cash position, ensuring that MidCap and the other Secured Creditors are protected from sudden swings in the Debtors' cash position.

7.     Spectrum Healthcare, LLC ("Spectrum"), Spectrum Healthcare Hartford, LLC ("Spectrum Hartford"), Spectrum Healthcare Manchester, LLC ("Spectrum Manchester"), and Spectrum Healthcare Torrington, LLC ("Spectrum Torrington" and, with Spectrum, Spectrum Hartford, and Spectrum Manchester, collectively, the "Spectrum Revolving Borrowers") are parties to that certain Amended and Restated Credit and Security Agreement, dated as of August 27, 2014 (as amended, supplemented, restated, or otherwise modified from time to time, the "MidCap Revolving Credit Agreement"), by and among the Spectrum Revolving Borrowers, MidCap, as administrative agent and lender, and the additional lenders from time to time party thereto. The Spectrum Revolving Borrowers' obligations under the MidCap Revolving Credit Agreement are secured by all of the assets of the Spectrum Revolving Borrowers. The

4

obligations of the Spectrum Revolving Borrowers under the MidCap Revolving Credit Agreement are guaranteed by the Debtors' principals, non-Debtors Howard Dickstein, Brian Dickstein, and Sean Murphy (collectively, the "Individual Guarantors").[2]

8. Pursuant to the MidCap Revolving Credit Agreement, MidCap agreed to provide the Spectrum Revolving Borrowers with revolving loans in the maximum principal amount of $6,500,000.00, which maximum principal amount was later increased to $7,500,000.00. As of September 30, 2016, MidCap had advanced $2,565,000.00 to the Spectrum Revolving Borrowers above and beyond the Spectrum Revolving Borrowers' borrowing base, of which $1,170,000.00 of the overadvance has been allocated to Spectrum Manchester and $1,395,000.00 of the overadvance has been allocated to the other Spectrum Revolving Borrowers. As of the Petition Date, the Spectrum Revolving Debtors are indebted to MidCap in the amount of $6,239,366.61, on which amount interest, fees, and expenses continue to accrue.

9. Spectrum Healthcare Derby, LLC ("Spectrum Derby") is party to that certain Credit and Security Agreement, dated as of June 13, 2013 (as amended, supplemented, restated, or otherwise modified from time to time, the "MidCap Derby Credit Agreement"), by and among MidCap, as administrative agent and lender, and the additional lenders from time to time party thereto. Spectrum Derby's obligations under the MidCap Derby Credit Agreement are secured by all of the assets of Spectrum Derby. The obligations of Spectrum Derby under the MidCap Derby Credit Agreement are guaranteed by the Individual Guarantors, the Spectrum Revolving Borrowers, and non-Debtor affiliate Spectrum Manchester Realty, LLC ("Spectrum Manchester Realty").[3]

---

[2] MidCap reserves all of its rights and remedies against the Individual Guarantors.

[3] MidCap reserves all of its rights and remedies against Spectrum Manchester Realty.

10. Pursuant to the MidCap Derby Credit Agreement, MidCap agreed to provide Spectrum Derby with revolving loans in the maximum principal amount of $1,250,000.00. As of September 30, 2016, MidCap had advanced $60,000.00 to Spectrum Derby above and beyond Spectrum Derby's borrowing base. As of the Petition Date, Spectrum Derby is indebted to MidCap in the amount of $1,244,880.96, on which amount interest, fees, and expenses continue to accrue.

11. Spectrum Manchester Realty is party to that certain Credit and Security Agreement, dated as of February 22, 2011 (as amended, supplemented, restated, or otherwise modified from time to time, the "MidCap Manchester Realty Credit Agreement"), by and among MidCap Funding II Trust ("MidCap Funding II"), as administrative agent and lender, and the additional lenders from time to time party thereto. Spectrum Manchester Realty's obligations under the MidCap Manchester Realty Credit Agreement are secured by all of the assets of Spectrum Manchester Realty, including the real property described in that certain Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of February 22, 2011 (as amended, supplemented, restated, or otherwise modified from time to time, the "MidCap Manchester Realty Mortgage"), by Spectrum Manchester Realty for the benefit of MidCap Funding II. The obligations of Spectrum Manchester Realty under the MidCap Manchester Realty Credit Agreement are guaranteed by the Individual Guarantors and the Spectrum Revolving Borrowers.

12. Pursuant to the MidCap Manchester Realty Credit Agreement, MidCap Funding II agreed to provide Spectrum Manchester Realty with a term loan in the maximum principal amount of $10,500,000.00. As of the Petition Date, Spectrum Manchester Realty is indebted to

MidCap Funding II in the amount of $8,310,878.33, on which amount interest, fees, and expenses continue to accrue.

## ARGUMENT

13. The Debtors filed the Bankruptcy Cases with less than one day's prior notice to MidCap, which holds a first priority lien on and security interest in all of the Debtors' assets. MidCap has spent the period between the filing of the Bankruptcy Cases and the filing of this Objection negotiating the terms of the Preliminary Order with the Debtors and will continue to do so in the anticipation of the first-day hearing.

14. While the good faith negotiations to this point have led to certain modifications to the Preliminary Order acceptable to MidCap, there remain significant issues with the Debtors' request for the use of cash collateral, which militate in favor of further modifications to the Preliminary Order or, alternatively, the denial of the use of cash collateral.

*Adequate Protection Payments*

15. The Debtors may not use cash collateral unless (i) MidCap consents,[4] or (ii) the Court authorizes such use. *See* 11 U.S.C. § 363(c)(2). The Court must prohibit the use of cash collateral unless MidCap's interest in its cash collateral is adequately protected. *See* 11 U.S.C. § 363(e); *see also In re Blackwood Associates, L.P.*, 153 F.3d 61, 67 (2d Cir. 1998) ("If a debtor seeks authorization to use cash collateral from the bankruptcy court under § 363(c)(2)(B) rather than under § 363(c)(2)(A), the bankruptcy court 'shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection' for the secured creditors' interest.").[5]

---

[4] The Debtors have not sought MidCap's consent to use cash collateral, and MidCap has not consented to the Debtors' use of cash collateral.

[5] This Objection shall be deemed a request for adequate protection under Section 363(e) of the Bankruptcy Code.

16. Adequate protection is intended to protect existing secured creditors against diminution in the value of their collateral and is required as a matter of law where secured creditors' prepetition collateral diminishes in value postpetition. *See In re Frank*, 103 B.R. 771, 774 (W.D. Va. 1989); *In re Continental Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) (holding that a debtor's right to use property of the estate is limited to where parties with an interest in such property are adequately protected).

17. The Bankruptcy Code does not define adequate protection but does provide non-exclusive examples of means of providing adequate protection, including (i) periodic cash payments to the extent of decreased collateral value, (ii) replacement liens to the extent of decreased collateral value, or (iii) other relief resulting in the secured creditor receiving the "indubitable equivalent" of its interest in the collateral. *See* 11 U.S.C. § 361. The Debtors have the burden of proving that MidCap's interest in its cash collateral is adequately protected. *See* 11 U.S.C. § 363(p).

18. The Debtors have clearly not established that they can provide adequate protection to MidCap. Each Debtor's Budget shows that the Debtors' cash position will be declining in the coming months. These thin margins in the Debtors' Budgets show that MidCap's interest in its cash collateral will be diminishing over the life of these Bankruptcy Cases.

19. The Budgets do not even account for significant costs that will be incurred during the pendency of the Bankruptcy Cases. Tellingly, while the Budgets include line items for "Chapter 11 Professionals" and "Chapter 11 US Trustee," the lines are blank. These costs could be significant, particularly if the Court determines that an official committee of unsecured creditors or patient care ombudsman should be appointed.

20. Because of the diminution in the value of its cash collateral, the replacement liens offered by the Debtors in the Cash Collateral Motion and Preliminary Order are plainly insufficient as they do not preserve the benefit of MidCap's prepetition bargain. *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) ("The purpose of 'adequate protection' for a creditor 'is to insure that the creditor receives the value for which he bargained prebankruptcy.'") (*quoting In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (en banc)).

21. This is particularly important where MidCap consistently overadvanced to the Debtors prepetition, including six days before the filing of the Bankruptcy Cases. In other words, the Debtors' borrowing base (and, thus, MidCap's collateral position) did not give the Debtors' enough availability under the MidCap Revolving Credit Agreement to meet their cash needs. MidCap is entitled to adequate protection to compensate it for the risks it undertook in overadvancing to the Debtors and the exposure it has where the Debtors' borrowings are not justified by the Debtors' borrowing base.

22. Furthermore, the mechanics of the MidCap Revolving Credit Agreement demonstrate the necessity of adequate protection payments. MidCap lends prospectively based on cash receipts expected to be deposited in the Collection Accounts. Thus, MidCap has already lent against amounts that will be deposited in the Collection Accounts postpetition, meaning that the Debtors have already received the benefit of the amounts that will be deposited postpetition. However, prepetition practice mandated that the amounts deposited in the Collection Accounts would be used to pay down the loans under the MidCap Revolving Credit Agreement. As more fully detailed below, that will not be the case postpetition. The entire balance of the Collection Accounts will be swept to the Debtors' operating accounts on a daily basis. Thus, the Debtors will receive the benefit of the same dollars twice – first, as those dollars formed the basis for

MidCap's prepetition loans to the Debtors and, second, as cash liquidity postpetition. Meanwhile, MidCap is left with a deteriorating collateral position, as once those dollars (be they loaned dollars or collected dollars) are spent, the cash is irretrievably gone, and MidCap is left with a circumscribed collateral base.

23. The Debtors can and should provide MidCap with adequate protection of its cash collateral. MidCap asserts that the Debtors should be required to use the significant government receivable expected to be received during the first full week of the case to pay down the principal of the revolving loans under the MidCap Revolving Credit Agreement by four hundred thousand dollars ($400,000.00). Furthermore, in addition to the principal paydown, the Debtors cannot adequately protect MidCap's cash collateral position without periodic interest payments. MidCap asserts that the Debtors should be required to make interest payments required under the MidCap Revolving Credit Agreement and the MidCap Derby Credit Agreement, which total approximately thirty thousand dollars ($30,000.00) per week.

24. Finally, the Debtors should not be permitted to escape their prepetition obligation to pay the Workers' Compensation Refund to MidCap when it becomes due. Payment of the Workers' Compensation Refund to MidCap was contractually agreed upon consideration for MidCap overadvancing revolving loans to the Debtors, and the Debtors agreed that the Workers' Compensation Refund would be used to pay down outstanding overadvances. Indeed, failure to pay the Workers' Compensation Refund to MidCap was incorporated as an Event of Default in the MidCap Revolving Credit Agreement. To allow the Debtors to escape this contractual obligation would be detrimental, as it would deprive MidCap of the expected repayment of at least some of the prepetition overadvances on a fairly expedited time frame. Thus, MidCap

submits that payment of the Workers' Compensation Refund is a necessary and appropriate form of adequate protection that should be ordered by the Court.

*Cash Management Structure*

25. The Debtors request that the Court order that the Debtors have "unfettered access" to the Collection Accounts; however, what the Debtors are really requesting is that the Court terminate the Deposit Account Control Agreement and Collection Account Agreement on the first day of these Bankruptcy Cases. Cash Collateral Mot. ¶ 39. The Debtors do not cite any case law in support of this extraordinary relief, which is wholly unnecessary.

26. There is absolutely no prejudice to the Debtors in maintaining prepetition cash management practices. The Debtors argue that access to the Collection Accounts is necessary in order to meet certain expenses. This argument is unavailing, however, where MidCap must sweep the entirety of the Debtor's receivables to the Debtors' operating accounts to avoid running afoul of the automatic stay. Indeed, under the prepetition cash management structure, the Debtors' will have *same-day access* to all of the Debtors' cash receipts.

27. While the Debtors will suffer no prejudice by the maintenance of prepetition cash management practice, MidCap would be greatly prejudiced by the changes requested by the Debtors. Under the Uniform Commercial Code (the "UCC"), MidCap's security interest in the Collection Accounts can only be perfected if MidCap has control over the account. *See* UCC § 9-312(b)(1); *see also* UCC § 9-314(a) (a secured party "remains perfected by control only while the secured party retains control"). While the replacement liens to be granted to MidCap under the Preliminary Order arguably maintain the perfection of MidCap's security interest in the Collection Accounts, the Preliminary Order also reserves the right of "the Debtors, any committee appointed under section 1102 of the Bankruptcy Code, any individual creditors or any

11

Case 16-21635    Doc 26    Filed 10/10/16    Entered 10/10/16 18:56:34    Desc Main
              Document      Page 12 of 16

subsequent Trustee" to challenge the Midcap Prepetition Liens in perpetuity. Preliminary Order ¶ 8. Eliminating MidCap's control from the Collection Accounts could potentially be used as an argument to argue that MidCap is not perfected in the Collection Accounts and avoid any MidCap Prepetition Lien on such Collection Accounts.

28. Furthermore, the prepetition cash management structure, which was a condition precedent to MidCap entering into the loan transactions with the Debtors, was not designed with the exclusive goal of facilitating repayment of the loans. Much of the benefit to MidCap of the prepetition cash management system is visibility into revenues and allows MidCap to reconcile those revenues with the Budget in real time. Without that visibility, MidCap would be relying exclusively on the Debtors for such reconciliation, which the Debtors are under no obligation to provide to MidCap except for cash receipt reports with a week-long lag. *See* Preliminary Order ¶ 2.

29. Maintaining the prepetition cash management structure does not prejudice the Debtors in any way. The Court should order that the prepetition cash management structure, including the provisions of the Deposit Account Control Agreement and Collection Account Agreement, should be maintained postpetition, which avoids substantial prejudice to MidCap and depriving MidCap of the benefit of its prepetition bargain.

*Budget Variances*

30. The Debtors request that, if payment of a line item is more than 5% greater than the corresponding payment anticipated in the Budget, the Debtors will give the Secured Parties a day-long period to object to the payment being made. *See* Preliminary Order ¶ 2. This procedure is insufficient to the extent it focuses exclusively on the expense side of the Budget and ignores variations in revenue that should necessitate MidCap's consent to the continued use

of cash collateral and, absent that consent, a hearing in this Court to determine whether the Debtors are entitled to the continued use of cash collateral.

31. For downward variations in revenue more than 10% greater than the revenue expectations outlined in the Budget, the Debtors should comply with the same procedures outlined above for line item variances. In other words, if revenue is more than 10% less than the revenue expected in the Budget, then the Debtors should be required to obtain MidCap's consent to continue use of MidCap's cash collateral. If MidCap declines to consent to the continued use of cash collateral, the Debtors should be required to renew their request for continued use of cash collateral before this Court. While the downward revenue variance will certainly affect the Debtors' ability to meet their expense obligations as set forth in the Budget, the foregoing revenue variance requirement will give MidCap advance notice of potential issues with the Debtors' financial health, including potential recoupments by governmental entities, and will ensure that the Debtors and MidCap, with the Court's involvement as necessary, will be able to manage problems effectively and before such problems become impossible to correct.

32. The requirement that the Debtors report downward revenue variances to MidCap also give responsibility to the party best positioned to monitor those variances, the Debtors. Without such a reporting requirement, MidCap would be forced to monitor the Collection Accounts on at least a daily basis in order to discover potential revenue issues. MidCap submits that a revenue variance requirement is in the best interests of monitoring the Debtors' continued viability and ensuring that these Bankruptcy Cases are as successful as possible.

## **RESERVATION OF RIGHTS**

33. MidCap expressly reserves its rights to raise any issue properly before the Court at the interim hearing on the Cash Collateral Motion as well as any subsequent hearing thereon.

MidCap also expressly reserves its right to amend or supplement this Objection, to introduce evidence supporting this Objection at any hearing on the subject matter of this Objection, and to file additional and supplement objections at the conclusion of discovery on such matters, if applicable. MidCap also reserves its rights to challenge whether the expenses shown in the Budget are reasonable and necessary costs of preserving the property of the Debtors' estates.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, MidCap respectfully requests entry of an order (i) sustaining the Objection, (ii) conditioning the Debtors' use of cash collateral on the modifications to the Preliminary Order outlined herein or, alternatively, denying the use of cash collateral, and (iii) granting such other and further relief as is just and proper.

Dated: October 10, 2016

    Respectfully submitted,

    */s/ Kevin J. McEleney*
    Thomas A. Gugliotti (ct05288)
    Kevin J. McEleney (ct27673)
    Updike, Kelly & Spellacy, P.C.
    100 Pearl Street, 17th Floor
    P.O. Box 231277
    Hartford, CT 06123-1277
    Telephone:    (860) 548-2661
    Facsimile:    (860) 548-2680
    Email: tgugliotti@uks.com
          kmceleney@uks.com

    -and-

    Katie G. Stenberg (*pro hac vice* admission pending)
    Tyler N. Layne (*pro hac vice* admission pending)
    Waller Lansden Dortch & Davis, LLP
    511 Union Street, Suite 2700
    Nashville, TN 37219
    Telephone:    (615) 244-6380
    Facsimile:    (615) 244-6804
    Email: john.tishler@wallerlaw.com
          katie.stenberg@wallerlaw.com
          tyler.layne@wallerlaw.com

    *Attorneys for MidCap Funding IV Trust*

## CERTIFICATE OF SERVICE

I certify that, on October 10, 2016, the foregoing Objection was served by the CM/ECF system for the United States Bankruptcy Court for the District of Connecticut.

                                                                    /s/ Kevin J. McEleney
                                                                    Kevin J. McEleney