UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

_____
IN RE:                                          )        CASE Nos.   16-21635 - 16-21639 (JJT)
                                                )
SPECTRUM HEALTHCARE LLC, ET AL )        CHAPTER            11
         DEBTORS.                       )
                                                )        ECF No.            707
_____)

### RULING ON THE DEBTORS' MOTIONS TO WIND-DOWN AND CEASE TO OPERATE THE DERBY NURSING HOME FACILITY

I.    PREFACE

Before the Court is the Motion for Order Authorizing the Debtors to Wind Down and

Cease to Operate the Derby Nursing Home Facility (ECF No. 707) ("Closing Motion"), as well

as the responses thereto. The Closing Motion again presents to this Court the issue of whether

the Court should approve the Debtor's business judgment to wind-down and cease to operate the

last affiliated nursing home in active Chapter 11 Proceedings, Spectrum Health Care Derby, LLC

("Spectrum Derby" or the "Facility"). The Facility has employed approximately 120 dedicated

healthcare workers and has provided a home, support and care for 103 elderly and otherwise

vulnerable residents. While during the course of these Chapter 11 Proceedings[1] the Court has

grappled with the toll that the closing of a nursing home might inflict upon the residents and rank

and file employees who have devoted skill, time and humanity to their service, once again, the

record demonstrates that the economic and legal realities of this Debtor cannot be ignored or

---

[1] These Chapter 11 cases were filed with this Court on October 6, 2016. They were administratively consolidated to include Spectrum Healthcare, LLC (Case No. 16-21635) (the "management company") and four nursing homes; Spectrum Healthcare Torrington, LLC (Case No. 16-21639); Spectrum Healthcare Derby, LLC ("Spectrum Derby or "Facility") (Case No. 16-21636), Spectrum Healthcare Manchester, LLC (Case No. 16- 21638); and Spectrum Healthcare Hartford, LLC (Case No. 16-21637). The Closing Motion has been advanced by the management company and Spectrum Derby. The business judgment reviewed herein is that of Spectrum Derby.

further assuaged. In addition to prolonged and substantial financial losses (annualized at $1 million) and an inability to fund administrative expenses, this Debtor has confronted fierce market pressures  (with excess beds), the costs of a lease and a collective bargaining agreement that have not matched its revenues, and a recognized inability to find a sustainable business model for the Facility that would be attractive to a buyer, or which might support a feasible reorganization.

As a court of equity, this Court is not unmindful of the social and public policies that undergird any decision implicating people's homes, healthcare and, also in this case, the livelihoods of dedicated caregivers. It is not, however, the province of this Court to legislate social and public policy on how to care for, or pay for the care of, our elderly. Both market forces, scarce public resources and volatility in healthcare policy have and will continue to challenge the long-term viability of the current nursing home model and the State's exercise of its rate and regulatory authority related to the care of its eldest citizens.

The course of these proceedings and the evidence in the record have amply demonstrated that the Facility is simply not financially viable and that months of efforts to make it so have proven to be unavailing or ultimately belated. Upon review of the record of the April 4, 2018 hearing, this Court finds that this Debtor lacks the capacity to reorganize and has run dry of the opportunity to sell an intact business, even with the late stage concessions by the Union and Love Funding Corporation/HUD. Further, MidCap, the Debtor's secured lender, who has long preferred to have replaced the Debtor's senior management, has demonstrably lost faith in those individuals during these proceedings. Having heard the uncontroverted business reasons to close the Facility, the Court hereby approves the Debtors' Motion and overrules the related objections.

II.     JURISDICTION

The Court has jurisdiction over these proceedings under 28 U.S.C. §§ 1334 and 157. These are core proceedings within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This Decision constitutes the Court's Findings of Fact and Conclusions of Law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

III.    FINDINGS AND CONCLUSIONS

Bankruptcy Code Section 363(b)(1) provides, in pertinent part, that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In determining a Section 363(b) application, the Court must "expressly find from the evidence presented before him at the hearing a good business reason to grant such an application." *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).  The Debtor must carry the burden of demonstrating, by a preponderance of the evidence, that a transaction outside the ordinary course is justified, and the objecting parties, here, the Union and the United States Trustee, are required to produce evidence with respect to their objections. *In re Flour City Bagels, LLC*, 557 B.R. 53, 77 (Bankr. W.D.N.Y. 2016) (citing *Lionel*, 722 F.2d at 1071).

In its seminal decision, *In re Lionel Corp.*, the Second Circuit identified a non-exclusive list of factors that bankruptcy courts should consider when deciding whether a movant has shown a sound business reason for transactions involving estate assets outside the ordinary course:

- the proportionate value of the asset to the estate as a whole;
- the amount of elapsed time since the filing;
- the likelihood that a plan of reorganization will be proposed and confirmed in the near future;

3

- the effect of the proposed disposition on future plans of reorganization;

- the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property;

- which of the alternatives of use, sale or lease the proposal envisions; and

- whether the asset is increasing or decreasing in value.

*Lionel*, 722 F.2d at 1071. During final argument, Debtor's counsel pointedly addressed each of these factors and delineated why each relevant factor weighed heavily in favor of closing.

Based upon the record of the hearing, and judicial notice of the docket entries, particularly those provisions related to benchmarks set forth in the cash collateral orders, the Court finds that the Debtor has proven the allegations[2] in the Closing Motion which are hereby incorporated by reference. Specifically, the Debtor has articulated sound business reasons sufficient to justify the closure of the Facility, including: (i) the inability of Spectrum Derby to garner acceptable bids from a buyer, or to engage in another sale process; (ii) MidCap's loss of confidence in the senior management, and its consequential unwillingness to support the Debtor's reorganization "proposal" as a feasible alternative, (iii) the Debtor's large pre and post-petition economic losses and financial inability to continue to fund operations; (iv) the unfavorable market for nursing home facilities in this State; and (v) the necessity of maintaining balanced relations with the Debtor's primary lender, MidCap, and the State, so as to avoid impairing the recently reorganized Spectrum Manchester by the State's exercise of cross-entity recoupments should this Facility be relegated to a receivership proceeding.

Notably, the Debtor's recitation in closing argument of the uncontested facts supporting the Closing Motion have gone on record without significant substantive rebuttal. While there is disagreement between the Debtor, the Union and the United States Trustee as to the appropriate judicial remedy to the present state of affairs, there is not a meaningful dispute regarding the

---

[2] *See* Mot. at ¶¶ 1-24, 26-39.

4

material facts adduced during the hearings on the Closing Motion. In fact, only the Debtor

presented testimonial evidence (bolstered by an offer of proof from the State regarding the costs

and likely negative outcome of a receivership). Additionally, while there was cross-examination

and a dispute about the import of that evidence, no facts to the contrary were advanced by any

party. The testimony in the record fully substantiated the Debtor's continuing financial losses,

the inability to pursue a renewed sale effort or refinancing process, and the effective expiration

of the Debtor's liberty to use cash collateral. In reviewing the Debtor's business justification as

to the exigencies supporting closure, this Court is satisfied that the standards articulated in *Lionel*

have been met. There are unquestionably good business reasons, if not a sheer necessity, for

proceeding with the wind-down and closure of the Facility. Indeed, no party in interest has even

posited that the Debtor possess the financial wherewithal to formulate, much less confirm, a plan

of reorganization or to bring renewed buyer interests to the table.

In lieu of closure, the Union has once again argued that this Court should relegate the

Facility to a state court receivership proceeding, which, at great cost (estimated at an incremental

$2.5 million) and redundancy of efforts, will compel the State to fund an additional closure

analysis and, perhaps, another sale effort. While additional time always inspires hope of the

remote possibility of an alternate outcome, there has been no evidence to support that such an

exercise would do more than delay the inevitable, at great cost and angst to all parties, and to the

potential detriment of Spectrum Manchester.

All of the key constituents, to varying degrees, have participated in the Chapter 11

disposition and reorganization efforts for more than a year to no ostensible avail. Under these

circumstances, this Court is loath to interfere with the reasoned business judgment of the Debtor,

particularly where the State, which has the prerogative of petitioning for a state court

receivership or asserting its regulatory authority, has not urged otherwise. Accordingly, there is

no cause for this Court to exercise deference or discretion in favor of a duplicative, ostensibly

wasteful and potentially damaging state court receivership process.

With regard to concerns about the continuing administration and fate of this Chapter 11,

any decisions regarding dismissal, conversion, or otherwise, are more appropriately reserved for

another day and further proceedings. This decision serves solely to authorize the wind-down and

closure of the Facility. Intervening events may or may not affect and influence whether other

considerations will be weighed in the decisions ahead.

IV.    CONCLUSION

While the Court shares the concerns of the residents, patients and staff regarding the

many stresses of closing Spectrum Derby, under these circumstances, the Debtor has presented a

thoughtful, orderly and palliative remedy to address those concerns. The wind-down and closing

plan has been designed in concert with and under the supervision and guidance of the State and

its agencies to mitigate the trauma of the unavoidable relocation of vulnerable or elderly

residents. Notwithstanding that the path of continuing care and the ultimate relocation of

residents weighs heavily on this Court, such concerns must now ultimately rest within the

regulatory province of the State. The Debtor's business judgment articulated in the Closing

Motion, while sobering, is nonetheless reasonable and appropriate.

Accordingly, Orders of this Court shall issue authorizing the Debtors to wind-down and

cease to operate the Facility.

Dated at Hartford, Connecticut this 9th day of April 2018.



James J. Tancredi
United States Bankruptcy Judge
District of Connecticut